CLERKS OFFICE US DISTRICT COURT
AT ROANOKE, VA
FILED
September 11, 2026
LAURA A. AUSTIN, CLERK
BY: /s/ Megan Poff
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | | |
|---|---|---|
| **KEVIN A. WATSON,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 7:25CV00581 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **K. FOX, et al.,** | ) | JUDGE JAMES P. JONES |
| | ) | |
| Defendants. | ) | |

*Kevin A. Watson, Pro Se Plaintiff; Timothy E. Davis, OFFICE OF THE ATTORNEY GENERAL, CRIMINAL JUSTICE & PUBLIC SAFETY DIVISION, Richmond, Virginia, for Defendants T. Fletcher, M. Owens, K. Almarode, and N. Keeney; Laura Maughan, SANDS ANDERSON PC, Richmond, Virginia, for Defendant K. Fox.*

The plaintiff, Kevin A. Watson, a Virginia inmate proceeding pro se, filed this civil rights action under 42 U.S.C. § 1983, alleging that the defendants were deliberately indifferent to his serious medical needs and that they retaliated against him for his participation in the prison grievance process in violation of his constitutional rights. Currently pending are the following two motions for summary judgment: (1) Motion for Summary Judgment filed by the defendant Dr. K. Fox, Dkt. No. 30, and (2) Motion for Summary Judgment filed by the defendants T. Fletcher, M. Owens, K. Almarode, and N. Keeney, Dkt. No. 33.

In response to the motion filed by defendants Fletcher, Owens, Almarode, and Keeney, the plaintiff Watson has requested that the court dismiss the claims against

those defendants with prejudice, based on his concession that he "cannot obtain sufficient evidence to create a dispute of material facts." Pl.'s Resp. 1, Dkt. No. 38. Accordingly, the claims against those defendants (claims H, O, and K) will be dismissed.

As to the remaining claims (claims J, L, and P) against Dr. Fox, a physician employed by the Virginia Department of Corrections (VDOC), the Motion for Summary Judgment has been fully briefed by the parties, and it is ripe for consideration. Upon review of the record, I conclude that the motion must be granted for the reasons that follow.

## I. Background.

Watson was incarcerated at Red Onion State Prison (ROSP) during all relevant times.[1] According to Watson's Complaint, on June 25, 2021, Dr. Fox approved a diet order, directing that Watson not receive milk or eggs during mealtimes because he is allergic to those foods. ROSP's food service personnel complied with the diet order from June 27, 2021, until May 2, 2023. Watson alleges that Dr. Fox rescinded the diet order on June 14, 2023, and that Dr. Fox admitted doing so during a medical appointment two days later.

[1] Watson has since been transferred to a different facility within VDOC. Notice of Change of Address, Dkt. No. 28.

On the morning of May 2, 2023, Watson claims that Fletcher, a food service employee at ROSP, denied his request for a milk substitute. Watson submitted a written complaint about this occurrence, to which Almarode, the food service director, responded that "we do not have therapeutic diets for an intolerance, only allergies." Compl. 29, Dkt. No. 1. Watson then filed a regular grievance and a similar response was given by ombudsman Vilbrandt. Vilbrandt stated that, "[p]er N. Keeney ('VA.DOC') Director of Nutrition Services, we do not have therapeutic diets for intolerances. Food service cannot offer you an alternative. Possibly address this with medical." *Id.* at 30. Watson filed a second written complaint and Owens, a food service employee, responded that "[f]ood service goes by the standard menu to provide an adequate nutritional meal. Food Services provides substitutes for allergies. As for the milk intolerance, you will need to talk with medical about getting a supplement for your milk." *Id.*

In the meantime, Watson claims that he was told by another ROSP employee that Dr. Fox had rescinded the diet order on June 14, 2026. During a medical appointment with Dr. Fox on June 16, 2023, Watson claims Dr. Fox told him that he did rescind the diet order.

On July 10, 2023, Watson had another medical visit with Dr. Fox, during which Watson asserts that Dr. Fox told him he would contact the food service to provide a substitution for milk. In following up on his prior written complaint by

filing a grievance, Warden White responded that "[m]edical has requested that eggs and milk be replaced by something else with your meals. This is what your medical provider has requested. Your current listed allergies include milk and eggs. The Lactaid was discontinued because milk was added to your allergy list. In accordance with the above information, this grievance is considered unfounded." *Id.* at 31.

But when Watson requested his milk substitution during breakfast on July 28, 2023, he claims that Fletcher denied the request once again, stating that "I cannot give you a substitution because DOC has not approved your milk allergy diet substitution." *Id.* at 32. Watson contends that when the complaint was filed, which was signed on April 28, 2024,[2] he had yet to receive a milk substitute.

Based on the above, Watson's claims against Dr. Fox have been construed as follows:[3]

> Claim J: Defendant Fox was deliberately indifferent to Watson's serious medical needs when he rescinded Watson's no milk and no eggs diet order. *Id.* at 36–37.

> Claim L: Defendant Dr. Fox retaliated against Watson in violation of the First Amendment by rescinding Watson's no eggs and no milk diet order. *Id.* at 39–40.

---

[2] Watson's Complaint was not signed under penalty of perjury.

[3] By Opinion and Order entered August 20, 2025, Watson's Complaint was severed into three separate civil actions. Op & Order, Dkt. No. 1-1. This case consists of Watson's Claims H, I, J, K, L, O, and P against defendants K. Almarode, T. Fletcher, Dr. Fox, John and/or Jane Doe, N. Keeney, and M. Owens. Claim I against John and/or Jane Doe was dismissed by Order entered November 21, 2025. Order, Dkt. No. 15. And, as stated above, Watson has voluntarily withdrawn Claims H, K, and O.

Claim P: Defendant Dr. Fox violated Watson's rights under Article I, Section 9, of the Virginia Constitution by rescinding Watson's no milk and no egg diet order. *Id.* at 48–49.

Op. & Order 3–4, Dkt. No. 1-1.

According to Dr. Fox, upon intake at ROSP in April 2021, Watson advised staff that he had food allergies to milk, cheese, beans, and eggs. An allergy test was conducted, which revealed that Watson had a low-level response to milk and eggs, indicating that "Watson likely was not allergic to milk or eggs because his bloodwork was not demonstrating sufficient antibody response to the potential allergens to qualify as a true medical allergy." Def.'s Mem. Supp. Summ. J. Fox Aff. at 3, Dkt. No. 31-1. Rather, based on Watson's described symptoms of stomach cramping and diarrhea upon consuming those foods, "Watson's symptoms were determined to be an intolerance." *Id.* at 4.

Dr. Fox explains that "there is a difference between a food allergy and a food intolerance." *Id.* Specifically, "[a] food intolerance affects the digestive system when an individual is unable to properly breakdown food. This typically causes gastrointestinal distress, like diarrhea, bloating, or cramping." *Id.* On the other hand, "[a] food allergy occurs when an individual's immune system recognizes the food item as an invader, and the body responds by producing immunoglobulin E (IgE) antibodies that travel to cells and release the chemicals that cause an actual allergic reaction, such as anaphylaxis." *Id.*

In any event, on June 25, 2021, Dr. Fox "followed up with Watson regarding his claimed allergies" and "Watson reported that he developed stomach cramps and diarrhea when he consumed milk and eggs." *Id.* at 3. Dr. Fox explained the results of the allergy test to Watson, but based on his symptoms, Watson requested "to have milk and eggs added to his chart as allergies." *Id.* Thus, Dr. Fox "wrote in his chart to notify food service regarding these food allergies, and to the best of [his] knowledge, Watson received a 'no eggs, no milk' diet order." *Id.* at 3–4. For two years, Dr. Fox did not receive any complaints from Watson regarding implementation of the diet order.

In early June 2023, Watson was evaluated by employees in the prison's medical department on several occasions based on his food-related symptoms. According to Dr. Fox's Affidavit, "[t]he [medical] records show that Watson's symptoms were determined to be an intolerance, and the milk and egg allergies would be discharged from his chart. The records also note that Watson was educated to avoid milk and eggs, but that these foods are not classified as allergies." Fox Aff. at 4–5.

Dr. Fox evaluated Watson on June 16, 2023, at which time Watson's "gastrointestinal sensitivity" was discussed. *Id.* at 5. Watson conceded that he had been receiving peanut butter as a substitute for eggs, but because he was not receiving a substitute for milk, Dr. Fox "explained to Watson that he might benefit

from Lactaid for his milk intolerance." *Id.* Dr. Fox defines Lactaid as "an over-the-counter brand name medication that can help alleviate symptoms like diarrhea, cramping, and bloating for some people who experience [gastrointestinal] issues when they consume dairy products." *Id.* at 5 n.1. Watson agreed to try Lactaid, and Dr. Fox described Watson as "very reasonable" during the conversation. *Id.*

However, at a follow-up appointment on July 10, 2023, Watson advised Dr. Fox that the Lactaid had not been helping his symptoms. Dr. Fox "noted in Watson's chart that his sensitivity to milk was still likely an intolerance rather than an allergy, but acknowledged that due to his current symptoms a dietary alternative to milk was reasonable." *Id.* Therefore, Dr. Fox "forwarded Watson's chart to the VDOC state dietician and requested a reinstatement of the 'no milk, no eggs' diet order." *Id.* The VDOC Western Regional Head Dietician was advised of Watson's intolerances and the lack of benefit from Lactaid, and she agreed to add Watson to the milk and egg allergy list. Dr. Fox declared that "to the best of [his] knowledge, Watson's 'no eggs, no milk' diet order was reinstated" on July 11, 2023. *Id.*

In his Response, Watson contends that it was Dr. Fox's decision to rescind the diet order and that such action demonstrates his deliberate indifference to Watson's serious medical needs. He further argues that Dr. Fox's decision to rescind the diet order was in retaliation for his complaints about food service staff's noncompliance with the diet order.

## II. Discussion.

### A. Standard of Review.

Rule 56 of the Federal Rules of Civil Procedure provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). "A fact is material if it might affect the outcome of the suit under the governing law." *Id.* In considering a motion for summary judgment, the court must view the facts and justifiable inferences in the light most favorable to the nonmoving party. *Id.* at 312–13. To withstand a summary judgment motion, the nonmoving party must produce sufficient evidence from which a reasonable jury could return a verdict in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### B. Eighth Amendment Deliberate Indifference.

"[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Overman v. Wang*, 801 F. App'x 109, 111 (4th Cir. 2020) (unpublished) (quoting *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209 (4th Cir. 2017) (internal quotation marks omitted)). The Supreme Court has stated that the Eighth Amendment imposes a duty on prison officials to provide inmates with

adequate food. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). "[T]his duty includes an obligation to provide a medically appropriate diet when necessary." *Scinto v. Stansberry*, 841 F.3d 219, 233 (4th Cir. 2016). While prisoners have a right to nutritionally adequate food, "[a] plaintiff must allege 'serious medical . . . deterioration attributable to' the challenged conditions." *Hammock v. Watts*, 146 F.4th 349, 361 (4th Cir. 2025) (quoting *Lopez v. Robinson*, 914 F.2d 486, 490 (4th Cir. 1990)).

To establish a claim of deliberate indifference to a serious medical need, a plaintiff must prove both "a subjective component and an objective component." *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008). The "analysis necessitates inquiry as to whether the prison official acted with a sufficiently culpable state of mind (subjective component) and whether the deprivation suffered or injury inflicted on the inmate was sufficiently serious (objective component)." *Id.*

A medical need is objectively sufficiently serious if it "rises above the level of de minimus harm" and "is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* at 238, 241. The evidence reveals that Watson has an intolerance to milk and eggs, which resulted in gastrointestinal issues. Although Watson originally deemed his medical issue an allergy in his Complaint, he refers to it as an intolerance throughout his Response to

the subject summary judgment motion. Furthermore, Dr. Fox explained in his Affidavit that an allergy causes a reaction, such as anaphylaxis, and Watson has offered no evidence of such symptoms to rebut the Affidavit in this regard. As Dr. Fox correctly pointed out in his brief, "complaints of indigestion, constipation, headaches, vomiting, and emotional distress do not generally constitute a serious medical need." *Compton v. Wang*, No. 7:21-cv-00478, 2022 WL 17477927, at *3 (W.D. Va. Dec. 6, 2022) (citing *Webb v. McKnight*, No. 7:06CV00734, 2006 WL 3761382, at *2 (W.D. Va. Dec. 20, 2006)).

Moreover, the deprivation must be "extreme." *Scinto*, 841 F.3d at 225. But Watson does not describe any extreme symptoms or deterioration, particularly where the diet order was only ineffective for approximately two months and he was given instructions by medical personnel to avoid milk and eggs in the interim. *See id.* (describing a substantial risk of serious harm as "longstanding" and finding that it is not an extreme deprivation when inmates are denied special diets so long as they are instead given instruction on how to eat the available meals in a way that satisfies their medical needs). Watson has thus not demonstrated that the deprivation he suffered was sufficiently serious.

Even so, Watson has failed to show that the defendant acted with a sufficiently culpable state of mind. To make this showing, Watson must have demonstrated that Dr. Fox "'[knew] of and disregard[ed] an excessive risk to [his] health or safety.'"

*Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (quoting *Farmer*, 511 U.S. at 837). Mere negligence or medical malpractice, however, is not deliberate indifference. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Furthermore, disagreement between an inmate and medical staff regarding the proper course of treatment provides no basis for relief. *Overman*, 801 F. App'x at 111 (citing *Bender v. Regier*, 385 F.3d 1133, 1137 (8th Cir. 2004)).

While the record shows that Dr. Fox was aware of Watson's medical issues, it lacks evidence that Dr. Fox disregarded an excessive risk to Watson's health. In fact, the opposite appears true. It is undisputed that Dr. Fox initially ordered a no-egg, no-milk diet for Watson based on his described symptoms in 2021. In 2023, food service employees refused to provide Watson with a milk substitute. According to the record, this action appears to be based on a change in food service policy and not on any medical decision made by Dr. Fox.[4] Then, after learning of Watson's complaints regarding his food-related symptoms in June 2023, Dr. Fox prescribed Lactaid to help with Watson's digestion and Watson agreed to try the medication. About one month later when Watson told Dr. Fox that Lactaid was not alleviating

[4] Submitted in support of the summary judgment motion filed by defendants Fletcher, Owens, Almarode, and Keeney was Chapter 3 of the Food Service Manual regarding therapeutic diets. Keeney declared that the manual was published on April 1, 2023, "noting that therapeutic diets would not be ordered to accommodate preferences, intolerances, or special requests." Def.'s Mem. Supp. Mot. Summ. J. Keeney Decl. at ¶ 6, Dkt. No. 34-1.

his symptoms, Dr. Fox promptly reinstated the no-milk, no-eggs diet order — even going so far as to involve the VDOC Western Regional Head Dietitian to enforce the order. As Dr. Fox notes his Reply brief, Watson fails to address Dr. Fox's efforts regarding the Lactaid prescription whatsoever. The Fourth Circuit has explained that

> a prison official's "[f]ailure to respond to an inmate's known medical needs raises an inference [of] deliberate indifference to those needs." *Miltier v. Beorn*, 896 F.2d 848, 853 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837, 114 S. Ct. 1970. However, even officials who acted with deliberate indifference may be "free from liability if they responded reasonably to the risk." *Farmer*, 511 U.S. at 844, 114 S. Ct. 1970.

*Scinto*, 841 F.3d at 226. Dr. Fox's unrefuted evidence of his prompt response to Watson's complaints by prescribing an agreed-upon medication and afterward reinstating the diet order rebut any allegations that Watson's health was disregarded. Given this unopposed evidence of Dr. Fox's efforts to alleviate Watson's symptoms, Watson similarly has not shown that any risk to his health was excessive. *See Overman*, 801 F. App'x at 111 (citing *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (concluding that a constitutional violation does not occur unless the medical provider's actions were "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness").

Although Watson originally stated in his Complaint that "through the date of filing this Complaint said Defendant(s) has not implemented the no-milk allergy

medical diet order by providing Plaintiff a substitution for milk when it is served," Compl. 32, Dkt. No. 1, he admits in his Response to Dr. Fox's Motion that Dr. Fox reinstated his diet order on July 11, 2023.[5] In that vein, Watson argues that Dr. Fox's reinstatement of the diet order "is evidence that he recognized that his action to rescind the June 25, 2021, diet order was inappropriate in light of the food intolerance risk and it was insufficient to protect plaintiff from such risk." Pl.'s Resp. 6, Dkt. No. 39. I cannot make that leap in logic based on such a conclusory allegation and the evidence in the record. *See Jackson v. Sampson*, 536 F. App'x 356, 357 (4th Cir. 2013) (unpublished) ("Conclusory or speculative allegations do not suffice, nor does a mere scintilla of evidence in support of the [the non-moving party's] case.") (quoting *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002)).

Ultimately, Watson has not shown that there is a genuine dispute of material fact regarding Dr. Fox's alleged deliberate indifference to Watson's medical needs, and Dr. Fox is entitled to judgment as a matter of law.

---

[5] According to the record, Keeney confirmed that "the Western Region dietitian communicated via email with food service to start the diet order immediately and provided guidance on what to substitute for milk and eggs," and that "Watson has had the no milk and no egg diet order in place since July 13, 2023." Def.'s Mem. Supp. Mot. Summ. J. Keeney Decl. at ¶¶ 13, 14, Dkt. No. 34-1. Enclosed with Keeney's Declaration are Watson's medical records and the July 2023 Diet Order, which directs that milk and eggs be added to Watson's allergies. Owens likewise affirms that "[f]rom the time we received the diet order, Watson has been receiving substitutions for both." *Id.* Owens Aff. at ¶ 5, Dkt. No. 34-2.

C. First Amendment Retaliation.

An official action motivated by retaliation for a plaintiff's exercise of a constitutionally protected right can violate the First Amendment, even if the act, when taken for a different reason, might have been legitimate. *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 283 (1977). That said, merely conclusory allegations of retaliation cannot suffice to state any constitutional violation actionable claim under § 1983. *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994). In addition, courts must treat an inmate's claim of retaliation by prison officials "with skepticism because [e]very act of discipline by prison officials is by definition retaliatory in the sense that it responds directly to prisoner misconduct." *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996).

To succeed on a § 1983 retaliation claim, Watson "must allege that (1) he engaged in protected First Amendment activity, (2) the defendant took some action that adversely affected his First Amendment rights, and (3) there was a causal relationship between his protected activity and the defendant's conduct." *Martin v. Duffy*, 977 F.3d 294, 299 (4th Cir. 2020) (quoting *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017)).

Dr. Fox does not dispute that Watson engaged in protected First Amendment activity by filing written complaints and grievances. Rather, Dr. Fox argues that, given the timeline of events, Watson cannot prove that Dr. Fox took adverse action

in response to Watson's filing of complaints or that there was a causal connection between the complaints and the change in his diet accommodations. Specifically, Dr. Fox states in his Affidavit that he "did not make changes to Watson's diet order because he had filed complaints. By the time [he] became aware that there was a disruption to Watson's diet, it was because he had filed a complaint that his diet had already been changed." Def.'s Mem. Supp. Mot. Summ. J. Fox Aff. at 8, Dkt. No. 31-1. At that point, Dr. Fox "tried to help" Watson by prescribing Lactaid and ultimately reinstating the no-milk, no-egg diet order. Def.'s Mem. Supp. Mot. Summ. J. 21, Dkt. No. 31.

Watson, on the other hand, insists that Dr. Fox took adverse action by rescinding the diet order after he complained about food service staff refusing to comply with the diet order. He explains in his Response to Dr. Fox's Motion that on May 2, 2023, food service staff refused to comply with the June 25, 2021, diet order and that he submitted a written complaint about the issue on that same date. He claims that his medical records show that Dr. Fox rescinded the diet order on June 13, 2023, "by authorizing nurse Holbrook to discharge said diet order from plaintiff's medical chart because plaintiff did not have food allergies but had food intolerances." Pl.'s Resp. 10, Dkt. No. 39. Watson asserts that this action was taken because he filed the written complaints and grievances against Fletcher, a friend of nurse Holbrook's. According to Watson, "it's reasonable for this court to infer that

said written complaint against Dr. Fox's friend – food service Ms. Fletcher motivated him to rescind the June 25, 2021, diet order after talking to nurse Holbrook on June 13, 2023." *Id.* at 12.

The parties do not dispute that food service staff stopped offering Watson alternatives to milk in May 2023, and there is no evidence that this action was initiated by any medical directives by Dr. Fox. Rather, the adverse action that Watson complains of here is that Dr. Fox subsequently rescinded the diet order on June 13, 2023. Although Watson claims that his medical records reflect this, he has not submitted any medical records to support that contention. But as Dr. Fox explained in his Affidavit, "[t]he records show that Watson's symptoms were determined to be an intolerance, and that milk and egg allergies would be discharged from his chart." Def.'s Mem. Supp. Mot. Summ. J. Fox Aff. at 4, Dkt. No. 31-1.[6]

---

[6] The only medical records in the case file were enclosed with the Declaration of N. Keeney, which was attached to the summary judgment motion filed by defendants Fletcher, Owens, Almarode, and Keeney. Upon taking an independent review of those records, there is a medical treatment form dated June 13, 2023. It provides as follows:

> [Watson was] seen [due to] kitchen not being able to accommodate milk & egg allergy. In 2021, he was written a no milk no egg diet [due to] stomach cramps & diarrhea. Prior lab work showed a low/equivocal result. Prior to 2021 there was no mention of a milk or egg allergy/intolerance. Today, he states milk & eggs cause him to have diarrhea, headaches & stomach pains . . . spoke to Dr. Fox. Agreed its an intolerance, not an allergy & OK to [discharge] allergy. [Discharge] milk & egg allergy. [Watson] educated he can avoid milk/eggs but are not classified as an allergy.

Def.'s Mem. Supp. Mot. Summ. J. Keeny Decl. Encl. D. at 23, Dkt. No. 34-1.

Thus, while Dr. Fox may have discharged the milk and egg allergy designation on Watson's medical chart in June 2023, there is nothing in the record showing that Dr. Fox specifically rescinded the June 25, 2021, diet order that had the effect of food service personnel refusing to provide a milk substitute.

Even if I were to consider Dr. Fox's approval of the decision to discharge the allergy designation from Watson's medical chart as an adverse action, Watson's retaliation claim fails where he has not shown a causal relationship between his protected activity and the defendant's conduct. To prove causation, "a plaintiff must plausibly allege that 'the defendants were aware of [the plaintiff's] engaging in a protected activity' and show 'some degree of temporal proximity to suggest a causal connection.'" *Gowen v. Winfield*, 130 F.4th 162, 173 (4th Cir. 2025) (quoting *Shaw v. Foreman*, 59 F.4th 121, 130–31 (4th Cir. 2023)).

Watson asserts that Dr. Fox rescinded the diet order on June 13, 2023, because of a written complaint filed on May 2, 2023, against Fletcher, a friend of Dr. Fox and Holbrook. Watson bases this allegation on a purported conversation that he had with Holbrook during a medical appointment when she stated, "I will make Dr. Fox take away your diet order" because of the "complaints against our friend," and that medical records show that Holbrook spoke with Dr. Fox on June 13, 2023. Pl.'s Resp. Mot. Summ. J. 11 Dkt. No. 39. Thus, Watson concludes that the written

complaints filed against Fletcher "motivated [Dr. Fox] to rescind the June 25, 2021, diet order." *Id.* at 12.

Watson's allegations regarding the conversation between Holbrook and Dr. Fox are highly speculative, and there is no evidence in the record connecting the written complaints against Fletcher to Dr. Fox's medical decisions. *See Thompson v. Clarke*, No. 7:17-cv-00010, 2020 WL 1124361, at *2 (W.D. Va. Mar. 2020) ("[T]he nonmoving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment.") (citing *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874–75 (4th Cir. 1993)). Other than the conversation between Holbrook and Dr. Fox, to which Watson was not privy, there is no evidence that Dr. Fox was aware of any complaints filed specifically against Fletcher. Watson cannot defeat a summary judgment motion based on such conjecture. Moreover, given that more than a month passed from the time a written complaint was filed to when Dr. Fox removed the allergy designation from Watson's chart, there is no temporal proximity to satisfy the causation element. *See*, *e.g.*, *Gowen*, 130 F.4th at 174 (finding temporal proximity sufficient to satisfy the causation element at the motion to dismiss stage where the plaintiff alleged that the complained action by officials occurred "*just hours*" after his oral complaint).

Therefore, no reasonable jury could find that Dr. Fox retaliated against Watson based on the circumstances.

D. Virginia Constitutional Claim.

In Watson's Claim P, he alleges that Dr. Fox acted with deliberate indifference to his serious medical needs in violation of the cruel and unusual punishments clause as set forth in Article I, section 9, of the Constitution of Virginia.[7] Watson does not make any argument regarding this state constitutional provision in his later filings. Under 28 U.S.C. § 1367(c)(3), the court may decline to exercise supplemental jurisdiction and has discretion to dismiss state claims where, as here, it has dismissed all claims over which it has federal question jurisdiction.

In determining whether to exercise supplemental jurisdiction, courts consider "the values of judicial economy, convenience, fairness, and comity." *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (internal quotation marks and citation omitted). For example, a District Court in Maryland declined to remand a case to state court after all federal claims had been dismissed, finding that the case did not appear to "involve state-law questions of first impression or unsettled, policy-laden matters best left to the expertise of Maryland courts." *Hall v. Greystar Mgmt. Servs., L.P.*, 179 F. Supp. 3d 534, 538 (D. Md. 2016). Rather, the case "involve[d] a straightforward application of hornbook tort law to an uncomplicated fact pattern," and the federal court was "fully competent to preside

[7] Article 1, section 9 of the Virginia Constitution provides "[t]hat excessive bail ought not to be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." Va. Const. Art. 1, § 9.

over such a matter." *Id.; see also Oliver v. Bartholomew*, 785 F. App'x 166, 167 (4th Cir. 2019) (unpublished) (holding that all factors weighed in favor of the district court retaining supplemental jurisdiction, including the fact that the plaintiff "brought the claims in federal court in the first instance, the factual allegations supporting the state law claims were identical to the allegations supporting the federal claims, the issues had already been briefed, and the state law questions were not novel or complex.").

For those reasons, I will assert jurisdiction over the state law claim and grant summary judgment for the defendant Dr. Fox. *See Quigley v. McCabe*, No. 2:17cv70, 2017 WL 3821806, at *6 (E.D. Va. Aug. 30, 2017) (determining that a claim under Article 1, section 9 of the Virginia Constitution is not actionable because this provision is not self-executing and does not create a private right of action).

## III. CONCLUSION.

For all the reasons stated, the Motion for Summary Judgment filed by defendants Fletcher, Owens, Almarode, and Keeney, Dkt. No. 33, will be denied as moot given Watson's voluntary withdrawal of the claims against them. The Motion for Summary Judgment filed by defendant Dr. Fox, Dkt. No. 30, will be granted, and judgment in the case will be entered in the defendants' favor.

ENTER: September 11, 2026

/s/ JAMES P. JONES
Senior United States District Judge